KANSAS CITY SOUTHERN RY. CO. v. SELF, Adm'r.

No. 11919—Opinion Filed Sept. 25, 1923.

1. Master and Servant—Action for Death of Servant — Railroads—Assumption of Risk.
Where the plaintiff's evidence tends strongly to show that her intestate was working under the direction of the employer's foreman, and violated his instructions and undertook a task entirely outside of his instructions and contrary thereto, he assumed the risks that were incident to such action, and a recovery for his injuries should be denied.

2. Same—Lack of Evidence of Negligence—Directed Verdict.
Where, as in this case, the plaintiff's evidence tends strongly to show that her intestate was working under the direction of the employer's foreman, and violated his instructions and undertook to perform a service contrary to such instructions, and injury resulted, there is no question of defendant's negligence to submit to the jury, and where a demurrer to plaintiff's evidence and a motion for a directed verdict are interposed, the same should be sustained.

3. Same.
Record examined, and held, that there is no evidence in the record reasonably tending to show actionable negligence on the part of the employer, entitling the plaintiff to a recovery.

(Syllabus by Shackelford, C.)

Commissioners' Opinion, Division No. 4.

Error from District Court, LeFlore County; E. F. Lester, Judge.

Action brought in the District Court of LeFlore County by D. F. Self, administrator in succession of the estate of Harley DeWitt, against the Kansas City Southern Railway Company, to recover damages for alleged personal injury received by Harley DeWitt because of which he is alleged to have died. Judgment for the plaintiff, and defendant appeals. Reversed and remanded.

James B. McDonough, for plaintiff in error.

W. B. Rutherford, for defendant in error.

Opinion by SHACKELFORD, C. This action was begun in the district court of LeFlore county on the 4th of August, 1919. A recovery is sought because of the death of Harley DeWitt which occurred on the 31st of January, 1918, it being alleged in the petition that Harley DeWitt was injured while in the employ of the defendant railway company on the 8th of October, 1917, because of a certain defective valve in a steam line which the employe was endeavoring to adjust, and in doing so the valve permitted a great quantity of steam to escape and strike the face of the employe, scalding him and driving cinders into his nose and otherwise injuring him, causing his death.

The defendant answered denyng any liability and alleging that the injuries, if any sustained, were because of the carelessness and negligence of Harley DeWitt himself, and further pleading a release from liability. The answer was replied to by plaintiff, putting the cause at issue.

The case was called for trial on August 9, 1920, and was tried to a jury, resulting in a verdict for plaintiff, and the defendant brings error.

The undisputed facts seem to be about as follows: The Kansas City Southern Railway Company at about the time of the injury, owned and operated a boiler house in the town of Heavener where steam was made for the purpose of operating a pump used to pump oil from a storage tank to a loading tank and to pump oil into fuel tanks on oil burning locomotives. From the said boiler house there is a lateral steam line running in an easterly direction several hundred feet, used to convey steam to the pump, and this line we will refer to as the main steam line. About 120 feet from the boiler house there is a lateral steam line connected to the main steam line, and running off in a southerly direction, or at about right angles from the main steam line. At about two feet from the main steam line and in the lateral line there was a cut-off valve, the valve here in question. This valve was in the lateral steam line for the purpose of regulating and cutting off the steam from the outer end of the lateral steam line. The lateral steam line extended to a wash house about 60 feet from the location of the valve. It seems that most of the steam line, both the main steam line and the lateral, are under the surface of the ground, and the lateral steam line at the point where the valve was located was about 14 inches down under the surface. The covering over the line where the valve was located was largely composed of cinders.

At the time of the injury of Harley DeWitt one Robert Mallory was in the employ of the defendant railway company as coppersmith, and it was a part of his work to fit pipes, etc., and Harley DeWitt was his helper, also in the employ of the defendant company. Harley DeWitt had been working there about two years. On the day of the injury Robert Mallory went out along the steam line with the purpose in view of going to the wash house and further extending the lateral steam line to an office house. He took Harley DeWitt with him as a helper and they went by the point where the valve was located and cleaned out the hole down to the valve and Mallory reached down and turned the valve so as to shut off the steam from the lateral line, after which he and Harley DeWitt went on to the wash house for the purpose of attaching other pipe to the lateral line. The end of the lateral steam line was plugged, and it being necessary to open the end of the line before attaching other line, Mallory loosened the plug and discovered that steam was still in the lateral line to the extent that it would be dangerous to remove the plug, and then told Harley DeWitt to go and cut off the steam and he went out for that purpose, and a few minutes later a loud noise like an explosion was heard, and on investigation it was found that Harley DeWitt had been hurt at the valve located in the lateral steam line. He was taken to a doctor for treatment, and after all superficial injuries were well he entered into an agreement with the claim agent for the railway company to settle his claim because of the injury and the company paid him straight time up to that date and he signed a release. Later on, it appears, Harley DeWitt had some kind of bronchial or lung trouble and went over into Arkansas to his father's house where he died as heretofore stated, and suit followed.

Upon the trial of the cause a verdict of the jury was returned in favor of the plaintiff and judgment thereon duly entered. In due course after the verdict was returned, defendant railway company filed its motion for a new trial assigning many errors, but the view we take of this case it will be necessary for us to examine only one of them for a proper disposition of the case. It is that the court erred in overruling the demurrer of the defendant to the evidence of the plaintiff.

At the close of the evidence the defendant demurred to the plaintiff's evidence, which was overruled and exception allowed, and thereafter defendant moved the court to instruct the jury to return a verdict for the defendant. This motion was overruled and denied and the defendant allowed an exception. Thus the question was raised as to the sufficiency of the evidence to support the verdict and judgment in favor of the plaintiff.

If there was any evidence in the case reasonably tending to prove actionable negligence upon the part of the defendant, the rulings of the trial court upon the demurrer and motion for a directed verdict were correct. If there was no evidence in the case reasonably tending to prove actionable negligence upon the part of the defendant, then the rulings of the court upon the demurrer and motion for a direction were erroneous and will necessarily work a reversal of the judgment. This leads us to carefully scrutinize the evidence for the purpose of determining as a matter of law whether there is any evidence in the record reasonably tending to support the verdict for the plaintiff.

We have heretofore set out certain facts in relation to the cause which are in no way

disputed. In truth, there is little or no dispute on questions of fact in the case. The dispute arises rather, as to the effect of the matters testified to.

On the part of the plaintiff, Robert Mallory was called as a witness, and his testimony on behalf of the plaintiff tended to show that he was a foreman or boss man in fitting steam pipes for the defendant, and that Harley DeWitt was his helper. That on the day of the injury complained of witness and DeWitt had the duty of extending the steam line from the wash house to another building. That they, together, went to the place where the cut-off valve was in the lateral steam line and cleaned out the trash from the hole down to the valve, and then witness turned the valve with his hand as tight as he could for the purpose of shutting off the steam from the lateral line. That DeWitt was standing there by him while this was being done. Then they went to the wash house and witness loosened the plug in the end of the lateral steam line and found that there was steam pressure in the lateral line notwithstanding his efforts to cut it off at the valve. That the pressure was strong enough to make it dangerous for them in the wash house to remove the plug, and it being necessary that it be removed so as to attach other pipe, they were obliged to cut off the steam from the lateral line. Witness then ordered DeWitt to cut the steam off from the main steam line. Upon this matter the following testimony is offered by the plaintiff, Robert Mallory testifying:

"Q. On that day, the 8th of October, did you give him any special instructions about any particular work? A. Yes, sir. Q. What were those instructions? A. To turn off the steam in a certain steam line. Q. What steam line was that? A. Steam line that run from the stationary boiler to a pump house and to a wash room and office building. Q. So you sent him out, then, with instructions to do what? A. Turn off the steam from this line. Q. From what line? A. From this main line. Q. You just gave him directions to make that repair? A. I gave him directions to shut off the steam. Q. You gave him directions to shut off the steam? A. Yes, I gave him directions to shut off the steam; this valve that is in question, at the time I shut it off, I shut it off myself, with my hand. Q. You went outside to fix it with your hand and you couldn't and then you sent Harley DeWitt out there—it wouldn't close? A. That valve wouldn't close; I told him to go to the boiler room and turn the steam off the main pipe line, at the boiler room is where I told him to shut this steam off at, but instead of going to the place on the main pipe line he stopped at this branch where I had shut it off myself. Q. Did you give him any special directions where to go? A. I told him to go shut the steam off from the main line. Q. What did you direct him to do? A. I directed him to turn the steam off from the main pipe line, which he would have had to take a ladder and went into the boiler room to do."

This was plaintiff's evidence about the instructions from the foreman under whom Harley DeWitt was working. Notwithstanding instructions to turn the steam off from main steam line, and the fact that he had seen his foreman shut the cut-off valve on the lateral steam line, Harley DeWitt went to the valve on the lateral steam line and there did something to the valve from which it blew out and injury resulted. What Harley DeWitt did to the valve no witness seemed to know. There is no dispute that plaintiff's witness Mallory had shut the valve and that DeWitt must have known it. It is in no manner indicated that DeWitt did not know that the valve had been screwed down as far as it would go—that it was completely shut so far as anything on the outside would indicate. The valve was made an exhibit and was brought up attached to the case-made, and we have examined it with interest coupled with curiosity to know what DeWitt did to it. There is no defect that we can see so far as the outside is concerned. It is apparent that it would not keep the steam from leaking through, and that was the conclusion that plaintiff's witness Mallory came to when he loosened the plug in the end of the lateral steam line at the wash house, and it is apparent that was the reason why he directed the steam to be cut off from the main line. For DeWitt to have turned the valve further than had been done by Mallory with his hand, and to a point where the steam would escape, would have broken it. It is not broken.

The conclusion we have reached is that DeWitt opened the valve and then turned it so hard that he unscrewed it from the part in which the pipeline was inserted. This is the only thing that could have been done so as to let the steam escape without breaking the valve.

As we see it from the plaintiff's own proof, this was a case of an employe violating instructions given him by his superior and injury resulting. It is not contended that Harley DeWitt did not understand the instructions or that he did not know the difference between the main steam line and the lateral line so he might have misunderstood the instructions given him by his foreman.

The rule that the burden is on the plaintiff to establish by affirmative proof some

degree of negligence on the part of the employer before a recovery may be had is so well established that citing authorities would be superfluous and unnecessary.

In this case, as we see it from the record presented, the plaintiff not only failed to show affirmatively that there was negligence upon the part of DeWitt's superior and the defendant; but did show affirmatively that he was injured because of his own failure to follow the instructions given him, and his failure to exercise due care for his own safety.

We think that the trial judge should have sustained the demurrer to the evidence of the plaintiff, and that when he overruled such demurrer he committed error which necessitates a reversal of the judgment.

We recommend that the judgment be reversed and the cause remanded, with instructions to grant the defendant a new trial.

By the Court: It is so ordered.